## ANNA C. BECK v. NORTHWESTERN FEDERAL SAVINGS & LOAN ASSOCIATION AND ANOTHER.[1]

October 20, 1939.

No. 32,119.

[1]Reported in 288 N. W. 217.

126

*A. E. Bryngelson,* for appellant.
*Edward Cohen,* for respondent.

Holt, Justice.

Suit to rescind the purchase of a house and lot, in the city of Minneapolis, from defendant Northwestern Building & Loan Association, a Minnesota corporation, located in the same city. The transaction was closed May 4, 1934. The trial was to the court and a jury. At the commencement of the trial plaintiff's counsel moved for the submission of certain issues to the jury. The record does not contain the motion or indicate the issues desired to be so submitted; but the court announced that such issues might be framed at the close of the testimony as the evidence would warrant. However, when plaintiff rested, defendant's motion for dismissal was granted. This appeal is from the order denying plaintiff's motion for a new trial.

Two defendants are named, the Northwestern Building & Loan Association and the Northwestern Federal Savings & Loan Association. But, as we understand it, the latter came into existence early in 1935 as a successor of the former. It appears conceded that there is only one defendant, so, if plaintiff has a right to

rescind the purchase, the change in name and the advantages obtained by the Northwestern Building & Loan Association becoming "federalized" pursuant to an act of congress do not affect the result. The case will therefore be treated as if there were but one defendant, namely, the Northwestern Building & Loan Association.

The complaint is very lengthy, but the substance of the averments of the fraudulent and false representations upon which rescission is predicated are that defendant by its agent stated that the reasonable, fair, and market value of the property was $4,000; that defendant had invested its own money to the extent of $4,000 therein; that the house thereon was well built and in excellent condition; that defendant was shaky financially; and that these statements were false and untrue, in that the property was worth only $2,000; that the house was not well built or in excellent condition but was built piecemeal by inexperienced workmen and of old and secondhand lumber, that defendant had not invested $4,000, but only $2,800 in a mortgage thereon, which it had foreclosed and on such foreclosure it bid in the property in 1932 for $3,042.56; and, further, that the representation that defendant was financially shaky was false. It was also alleged that on May 4, 1934, plaintiff was not mentally competent to transact any business. There were allegations in the complaint from which plaintiff now argues that defendant stood in a fiduciary relation to her; but there is no direct allegation of such relationship or of facts from which it could be inferred.

The evidence was, in substance, that plaintiff's husband, who carried on a bookbinding business with a partner, died in the spring of 1931. Plaintiff administered his estate. In the summer or fall of 1931 one Hagstrom, an agent of defendant, learned that plaintiff had some money to invest and called on her for the purpose of selling her stock in defendant. She did invest $2,000 in 20 shares of defendant's stock. The investment was supposed to return semiannual dividends. Business depression reduced the income of defendant so that in January, 1934, plaintiff and the other shareholders and members were notified that for the period

ending December 31, 1933, a dividend of one per cent only would be declared and paid. The shareholders were advised in June, 1934, that efforts were made to "federalize" defendant and strengthen it, but that, although twice as much as the previous December dividend had been earned, no dividend would be declared in that June, because it was deemed to enhance the prospect of "federalizing" defendant. About the middle of April, 1934, Hagstrom called on plaintiff and told her of this property which could be acquired by applying her stock on part of the purchase price and giving a mortgage for the balance. It is claimed that Hagstrom told plaintiff that "it was hard telling when we would get our money out of the Association; perhaps we would never get it out"; and that this statement caused plaintiff to become interested in the trade offered. Plaintiff at that time was 76 years of age. At the time of the trial in December, 1938, she was past 80, and, judging from her testimony, her mind was then so far gone that she could not recall what was said or done in April and May, 1934. The case insofar as relates to the alleged misrepresentations and fraud must therefore rest wholly upon the testimony of plaintiff's daughters—Florence, then about 33 years of age, and Agnes, 10 years older. The latter was not present all of the time at the meeting when the actual representations inducing the trade were made. After this talk with Hagstrom, he took plaintiff and Florence to view the property. They passed into every room of the house except the basement. It had seven rooms and bathroom, with a lavatory on the first floor, and glass-enclosed front and rear porches. That the representations that the market value or reasonable value of the property, and the defendant's investment therein was $4,000, was the ordinary trade talk, upon which plaintiff and her daughter placed no reliance, appears from the fact that Florence suggested that an appraisal be procured and that plaintiff refused to enter into any contract on this first inspection, stating that she wanted Agnes also to see the premises before any decision was reached. The key to the house was thereupon given to plaintiff or Florence so that the appraisal might be had if determined upon, and that it

might also be inspected by Agnes. The next Sunday, while Hagstrom was on the premises in the act of renting the same, plaintiff and both daughters came there and again every room in the house was inspected. On each visit, about 45 minutes were spent in the house according to Florence, who, however, says most of the time was spent on the porch, because being enclosed it was warm and comfortable. A week or so after this last inspection, on May 4, 1934, Hagstrom came to plaintiff's home and took her to defendant's office, where she signed the contract attached to the complaint for the purchase of this property. At that time or later the contract was carried out and the property deeded to plaintiff, she giving back a mortgage for $3,000. The purchase price was $4,000, $1,000 of which was paid by applying the value of ten shares of her stock thereon. The house was rented for $35 a month at the time the transaction was closed. The rent was collected by defendant for 17 months thereafter, without charge, and turned over to plaintiff monthly, she paying the interest on the mortgage and taxes. Thereafter, by agreement, defendant collected the rent and applied it on taxes, repairs, and the balance on the interest and mortgage. In January, 1935, plaintiff, without any suggestion from defendant, withdrew $500 from her credit account with defendant upon her remaining ten shares and applied it upon the purchase money mortgage. No complaint of fraud or misrepresentations inducing the purchase of the house and lot were made prior to October, 1937.

It is insisted that plaintiff made out a *prima facie* case for submission to the jury of fraud and incompetency. We think there is no evidence to support a finding of incompetency. The testimony of the medical expert who never saw plaintiff until called to examine her August 24, 1937, and again September 8 and October 12, the same year, amounts only to this, that in his opinion "she couldn't transact business with good judgment" on May 4, 1934. The only other witnesses were her daughters, who, after testifying to such facts as plaintiff keeping on hand for her own use five or six pairs of stockings, patronizing canvassers to the extent of buying a dozen bars of medicated soap and eight or ten

bottles of polish, turning the gas jet too high, causing the coffeepot to boil over, buying newly baked cake while having remnants of cake on hand, forgetting to close the door of the icebox, and like incidents of lapses of memory, gave their opinion that plaintiff was incompetent to do business at the time she entered into the contract for the house and lot. They concede that she was doing the housework at that time and was left alone in the home while they were at work. They apparently had no apprehension that in their absence their mother would come to grief by turning the gas too high or turning it on without seeing that the burners were lit. They both knew the trade was made on May 4, 1934. Florence endorsed and cashed for her mother the rent check for that month. There is no question that both daughters knew of the transaction, and the evidence leaves no room for a doubt that it was a family affair fully considered not only by plaintiff but by her two intelligent and mature daughters, who then had no idea that plaintiff was incompetent. No verdict finding that plaintiff was mentally incompetent to conclude a business transaction such as was concluded in May, 1934, could be permitted to stand.

As to the misrepresentation of value, the general rule is that value of property such as a house and lot which have no market value like property sold on stock or commodity exchanges, where a market value can be ascertained as of any date or hour, is not the subject of actionable misrepresentation. The value of such property is more a matter of judgment and opinion. Insofar as representation of what the property cost the defendant, it is a representation of a fact. But there was no proof offered as to the amount defendant had paid for or invested in the property. Plaintiff offered no evidence in respect to the alleged misrepresentation as to the house other than that it was "well built and in good condition." Whether well built or in good condition was readily ascertainable from inspection, which admittedly was made by both plaintiff and her daughters. There was no representation as to the kind of material used in the construction; hence there was no error in excluding the testimony offered that old or used lumber entered into the construction.

The course of trial and counsel's argument here indicates that more significance is given to the representation in respect to defendant's financial condition and consequent value of the ten shares of stock applied as part payment of the house and lot than to the misrepresentation in respect to the house, the argument being that by misrepresenting the financial condition of defendant and the value of its shares of stock plaintiff was induced to part with her ten shares in the transaction. Koch, defendant's secretary and manager, was called for cross-examination under the statute, and it was elicited that in 1933 and 1934, owing to lack of income, members could not withdraw the funds invested in shares of stock as ordinarily permitted. Building and loan associations are under the supervision of the state banking department, and under rules and regulations (whether of the banking department or of defendant does not appear) in existence from September, 1933, until January 18, 1935, the board of directors of defendant were permitted to pay needy stockholders who had given proper notice of withdrawal no more than $1,000, and then, if more was desired, they must take their place at the foot of the waiting list. That defendant was in financial straits is also indicated by the fact above referred to, that a one per cent dividend was declared instead of the usual large one. It appears that the evidence would not support a finding that defendant misrepresented its own financial situation or the value of the ten shares of stock accepted in payment of $1,000 on the purchase price of the house and lot.

But we need not further discuss the alleged misrepresentations and fraud, for we are convinced that the evidence discloses such a long delay to seek redress after full opportunity to learn of the false or fraudulent representations, if any there were, inducing the transaction of May 4, 1934, that plaintiff must be held to have ratified and affirmed the same. This in Kraus v. Thompson, 30 Minn. 64, 67, 14 N. W. 266, 267, 44 Am. R. 182, states the law:

"Any act of ratification of the contract, after knowledge of the facts authorizing a rescission, amounts to an affirmance and ter-

minates the right to rescind; but, if done before such knowledge, it will have no such effect."

To the same effect are Crooks v. Nippolt, 44 Minn. 239, 46 N. W. 349; Marshall v. Gilman, 47 Minn. 131, 49 N. W. 688; Parsons v. McKinley, 56 Minn. 464, 468, 57 N. W. 1134; O'Neil v. Davidson, 147 Minn. 240, 180 N. W. 102. In Parsons v. McKinley, *supra,* it is stated:

"It is the duty of a party who has been induced to enter into a contract through fraud to act upon the first opportunity after discovering such fraud, and to rescind the contract by repudiating its obligations and restoring what has been received under it, if he desires to avail himself of his right to rescind. He is bound to elect what course he will pursue within a reasonable time, at least, after learning of the deception, and is not at liberty to hesitate and delay or wait for a future view of his own convenience, or of the market value of the property, before determining the question of affirmance or rescission."

The syllabus in O'Neil v. Davidson, 147 Minn. 240, 180 N. W. 102, contains this paragraph:

"The evidence conclusively established that defendant, after learning of the deceit of which he complains, remained in possession of the leased premises and paid several instalments of rent. Such conduct affirms the lease, and equity will not decree a rescission."

Counsel argues that the court in granting a dismissal did not state that it based the ruling upon affirmance by the long delay or laches after full knowledge of the falsity of the alleged representations; and, furthermore, that that was defensive matter, not to be considered when plaintiff rested. Authorities need not be cited to the proposition considered that a correct ruling, though placed upon untenable grounds, will not be reversed; nor that when plaintiff's case has disclosed a good defense a dismissal is justified. Plaintiff and her daughters had resided for many years in Minneapolis; they had friends residing in the locality where the house in

question was located, whom they visited; they owned their own home and a building in Austin, this state, and must have possessed some knowledge of values; they knew that some repairs were needed and made; still, from May 4, 1934, to October, 1937, no complaint was made to defendant that it or its agent had made false representations of any sort respecting the house, or with regard to the financial responsibility of defendant or the worth of its shares of stock. When in January, 1935, plaintiff without suggestion from defendant withdrew $500 of the amount credited to her remaining ten shares in her passbook and requested that that amount be applied upon the $3,000 purchase mortgage on the house and lot she knew from the two letters she introduced in evidence that the representations testified to by Florence and Agnes in respect to the condition of defendant and the 20 shares of its stock plaintiff held in April, 1934, were absolutely false. One of these letters was dated January 5, 1934, and the other June 30, 1934. These were, evidently, circular letters sent to every shareholder or member of defendant. We need cite no authorities other than those above to the proposition that equity will grant rescission of a transaction induced by fraud and false representation if the party injured makes timely application. But according to the same authorities we think plaintiff by her own showing disclosed that there had been an affirmance of the transaction, and that the order of dismissal should stand.

Order affirmed.

PETERSON, JUSTICE (concurring specially).

I concur in the result solely on the ground, stated in the majority opinion, that plaintiff ratified the contract while it was still executory by acts of performance.

I cannot agree that the representations as to value and the character of the building were merely trade talk. They were fraudulent representations of fact upon which plaintiff relied and were actionable under our rulings in Drake v. Fairmont Drain Tile & Brick Co. 129 Minn. 145, 151 N. W. 914; Ludowese v. Amidon, 124 Minn. 288, 144 N. W. 965, and similar cases.